**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**James PEACOCK, Defendant-Appellant.**

**No. 14449.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 18, 1987.

**88**

Philip A. Glades, David Robards, Joplin, for defendant-appellant.

William L. Webster, Atty. Gen., Paul La-Rose, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

GREENE, Presiding Judge.

After jury-trial, defendant, James Peacock, was convicted of the class D felony of promoting prostitution in the third degree. § 567.070.[1] The jury verdict recommended imprisonment for nine months and a fine, whose amount was to be determined by the court. The trial court sentenced Peacock to nine months' imprisonment and fined him $5,000. This appeal followed. We affirm.

The criminal charge filed against Peacock alleged that from November 28 through December 19, 1984, in Jasper County, Missouri, Peacock knowingly provided premises, specifically described in the information, for prostitution purposes. Section 567.070 states that "[a] person commits the crime of promoting prostitution in the third degree if he knowingly promotes prostitution." Knowingly is defined in § 562.016.3(1) as when one "is aware of the nature of his conduct or that those circumstances exist...." Section 567.010(1)(c) defines promoting prostitution as when one "provides persons or premises for prostitution purposes...." Prostitution is defined by § 567.010(2) as meaning engaging, or offering or agreeing "to engage in sexual conduct with another person in return for something of value...."

Peacock's first point relied on is that the evidence was insufficient to sustain the jury verdict as the evidence failed to exclude a reasonable hypothesis that 1) the sexual activity that witnesses described as taking place on the premises was gratis and, therefore, not prostitution, or 2) that Peacock had no knowledge that prostitution was taking place on the premises.

In regard to the first sub-point, the state contends there was direct evidence of prostitution occurring on the premises. On the second sub-point, the state contends that guilty knowledge was supplied by circumstantial evidence.

■ Where an element of the state's case must be supplied by circumstantial evidence, the facts and circumstances in evidence must be consistent with each other, and with the hypothesis of guilt, and must be inconsistent with innocence and exclude every reasonable hypothesis of innocence. *State v. Prier*, 634 S.W.2d 197, 199 (Mo. banc 1982).

The trial was held on June 27, 1985. The state's evidence, which was undisputed since defendant presented no evidence, was as follows. Lloyd Denman testified that his company, Trinity Transportation Services, Inc., owned the property in question, which was located on East Seventh Street in Joplin, Missouri, and that it had been rented to Peacock, doing business as Tokyo Sauna. Denman said that he had conversations with Peacock concerning the terms of the tenancy and, on a number of occasions, concerning repairs to be made to the premises. Denman testified that Peacock was at the Tokyo Sauna "3 to 5 days a month," and that he did not know how Peacock "did business."

Debbie Stevens, an employee of Trinity Transportation, testified that Peacock paid the rent on the building used by Tokyo Sauna, that he always paid in cash, and that Peacock had done so since October of

---

1. Unless indicated otherwise, all references to statutes are to RSMo 1978, V.A.M.S., and all rules are to Missouri Rules of Court, V.A.M.R.

1984, when Trinity Transportation bought the property. Evidently, Peacock and Tokyo Sauna had been a tenant of the prior owner, and that tenancy continued under the new ownership.

State's witness D.R., an undercover agent for the Jasper County Sheriff's Department, testified that on November 28, 1984, at the direction of a sheriff's deputy in charge of the investigation, he went to the Tokyo Sauna to see "what kind of activity was going on there." D.R. had been given $80 by the deputy sheriff "to use if need be" in connection with his investigation. When he entered the building, Peacock, an older woman and a young oriental female, whose name he later learned was "Chun," were seated in the front room. Chun approached D.R. and asked if she could help him. When he said yes, Chun took D.R. to a back room and explained the price range for her services, which was $40 for a massage, $50 for a massage and body shampoo, and $80 for "everything." "Everything" was not explained at the time, but D.R. opted to try it, and paid Chun the $80.

D.R. was then given a sauna steam bath, a body shampoo, and a complete body rub with oil, after which Chun put D.R.'s penis in her mouth, which was followed by regular sexual intercourse, with Chun on top. When the sex acts were completed, Chun told D.R. that when he came back to bring $100 and they would have sexual intercourse twice. D.R. then put his clothes on. While he was leaving, he noticed that Peacock and two women were sitting in the front room. Peacock, or one of the women, said "come back."

The last state's witness was B.D., who was a police officer and undercover agent for the sheriff's department. He testified that on December 19, 1984, he went to the Tokyo Sauna to try and determine if "any prostitution was taking place." What happened then was almost an instant replay of D.R.'s experience, except that B.D. did not see Peacock on the premises. The girl priced her services, including $80 for "everything." B.D. paid the $80 and received the full treatment, including the oral sex and regular sexual intercourse.

The state's evidence was sufficient to support a reasonable inference that sex was being sold on the premises, which constitutes prostitution, and that Peacock not only knowingly provided premises for prostitution, but that he had actively promoted it by being present when D.R. was told to come back. The point has no merit.

In his remaining point, Peacock alleges that he was denied his right to a fair trial because comment and gestures of trial spectators indicated their belief that Peacock was guilty, and that such conduct influenced the jury.

A review of the record clearly shows that defense counsel, after voir dire, was told by his legal secretary that spectators were commenting unfavorably regarding statements made by defense counsel during voir dire, and that she thought the prospective jurors could hear such remarks. Defense counsel did not make any objection, or request that the court take some type of affirmative action at that time, or at any time during trial, but later, in his motion for new trial, alleged that the spectators were not only commenting unfavorably regarding the defense theory of the case, but also, by nodding and shaking their heads, indicating their approval or disapproval of the trial tactics of the prosecutor and defense counsel.

Allegations of error of this type, when counsel had notice of spectator misconduct during trial, which are raised for the first time in a motion for new trial, are insufficient to preserve the matter for appellate review. *State v. Hall*, 675 S.W.2d 471, 473 (Mo.App.1984).

Because Peacock claims that spectator misconduct violated his constitutional right to a fair trial, we review the point under the plain error doctrine, Rule 30.20, to see if spectator misconduct caused a miscarriage of justice. *State v. Arnold*, 676 S.W.2d 61, 63 (Mo.App.1984).

A post-trial evidentiary hearing was held on the spectator misconduct issue, during which five witnesses testified. Four of the

witnesses, including three lawyers who are officers of the court, testified that the spectators in question were Ben Alexander and two or three ladies who accompanied him. We glean from the record and past records we have examined from the Jasper County area, that Alexander is the chairman, or spokesman, for a group that calls itself the Joplin Chapter of Citizens for Decency Through Law. This group evidently regards itself as the moral watchdog of the community, and gathers evidence, makes complaints to the prosecutor, and attends trials in cases involving prostitution, pornography, and similar types of behavior which statutory law classifies as crimes affecting the moral climate of the community. All four witnesses stated that they saw Alexander and his friends make gestures and comments which indicated their approval of the prosecutor's position, or disapproval of defense counsel's position. Three of them stated they saw some of the jury members looking at Alexander at the times the gestures and comments were made. However, the state's witness on the issue, who was the court bailiff, testified that he sat within six to seven feet of the suspect spectators during the entire trial and "at no time during the trial did I see them make any comments or gestures in any way that I thought was—could possibly make any impression on the jury." In addition, during a colloquy with the attorneys, the trial judge said he hadn't heard any "whispering" from the spectators, and, if he had, he would have stopped it.

It is elemental that due process includes the right to have a fair trial before an impartial jury that has not been influenced by anything other than properly introduced evidence, the court's instructions, and the attorneys' arguments. That right is threatened if self-appointed guardians of the public's morals are permitted, through speech, gestures, demonstrations and the like, to make a calculated attempt to improperly coerce the jury into adopting the watchdog group's point of view. Courts should be extremely vigilant to ensure that such demonstrations do not occur, and, if they do, to take immediate corrective action.

In this case, the trial judge said he was unaware of any disruptive behavior, and, if he had noticed any, he would have corrected it. The court bailiff made the same observations. Defense counsel, who had been alerted by his secretary as to possible spectator misconduct, evidently saw or heard none, as he made no complaint at time of trial. We also note that a class D felony, which is what we have here, carries a maximum penalty of five years' imprisonment. The jury recommended a sentence of nine months, which indicates to us that, even if the jury had seen or heard anything from the Alexander group, they evidently were not very impressed by it.

The evidence of guilt was strong, and it was undisputed. Under all of the circumstances, even if there was spectator misconduct, we cannot say, as a matter of law, that it caused manifest injustice or a miscarriage of justice. We find no error, plain or otherwise. The point is denied.

Judgment affirmed.

CROW, C.J., and MAUS, J., concur.