STATE of Missouri, Respondent,

v.

Marvin L. GOFF, Appellant.

No. SC 85564.

Supreme Court of Missouri,
En Banc.

March 9, 2004.

Rehearing Denied April 13, 2004.

Kent Denzel, Office of the Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda S. Lemke, Asst. Atty. Gen., Jefferson City, MO, for respondent.

LAURA DENVIR STITH, Judge.

Marvin Goff was convicted of the class C felony of stealing under section 570.040 [1] and sentenced to fifteen years imprisonment as a prior and persistent offender. Mr. Goff asserts on appeal that the trial court erred in overruling his motion to suppress certain incriminating evidence because the State did not show that police officers had reasonable suspicion to conduct an investigatory stop of his automobile or a subsequent frisk of his person under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (*"Terry"*). Finding that the collective information possessed by the two officers involved in the stop was sufficient to establish reasonable suspicion of criminal activity and that Mr. Goff's other claims are without merit, this Court affirms the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence adduced at the motion to suppress hearing and at the subsequent jury trial was as follows. At about 3:00 a.m. on July 24, 2001, Marvin Goff and Patrick Trent drove into the Wal–Mart parking lot in Gladstone, Missouri. Although the Wal–Mart was open twenty-four hours, the north and south entrance doors were closed each night after 11:00 p.m., leaving only the middle doors available for use. Officer Mitzi Boydston entered the parking lot and saw Mr. Goff's vehicle parked illegally in the fire lane next to beverage vending machines located outside the locked south doors of the building. Both men were outside of the vehicle at this time. As Officer Boydston drove by, the men noticed the police vehicle. Mr. Trent then got inside the men's car, and Mr. Goff walked to the locked doors and pulled on their handle as if trying to open them.

While continuing to drive through the parking lot, Officer Boydston radioed her dispatcher. She stated that she saw a car with two men by the Wal–Mart vending machines and asked for a check on the car's license plate. The dispatcher ran the license number and the address of the registered owner and radioed back that the owner of the car had no warrants but "someone living at that address known to operate that car had several outstanding warrants." [2] Officer Boydston immediately returned to the area where Mr. Goff's car was parked, but the car and the two men had already left. She broadcast this information over her radio and began looking for the car.

Patrolling nearby, Officer Easley heard Officer Boydston's broadcast and began looking for the men's car also. Ten minutes later, he found the car in the parking lot of a twenty-four-hour Hy–Vee grocery store located across the street from Wal–Mart. It was parked in front of three vending machines, and the two men were standing by the machines. As soon as he saw Officer Easley drive by, Mr. Trent walked to the car and got in the driver's seat, while Mr. Goff went inside the Hy–Vee.

Officer Easley drove by again, and Mr. Trent moved the car to a parking space. Officer Easley then parked his squad car

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. No evidence was presented as to the identity of the person with these warrants.

behind Hy–Vee, where he could see Mr. Trent but believed he could not be seen. He saw Mr. Trent exit the car, open its hood, look around quickly as if to check whether anyone was watching, place something in the engine compartment, which the officer later testified might have been a small bag, close the hood, and get back in the driver's seat. The officer was sure that Mr. Trent did not open the hood to work on or check the engine.

Shortly thereafter, Mr. Goff returned from the store with a soda, and the two attempted to drive away. Officer Easley pulled his squad car up behind them and activated his lights. The men appeared nervous as he asked them for their identification and checked for outstanding warrants. Upon learning that Mr. Trent had an outstanding warrant, Officer Easley arrested him and asked the two to exit the car. He patted both down for weapons. The officer felt a large object in Mr. Goff's pants pocket and asked him what it was. Mr. Goff replied "I don't know" and gave Officer Easley permission to retrieve the object. The officer drew out a long, large metal object that he later testified "looked like one of those key locks on the vending machine," and "appeared to be, like, a master tool or a universal key of some sort."

Desiring to check whether the object was a key, Officer Easley placed it in the lock to one of the Hy–Vee vending machines and found that it fit. He noticed that the vending machine door was pried open one or two inches and its padlock was missing. He arrested Mr. Goff. He then looked inside the vehicle and saw a large number of quarters in plain view on the passenger seat floorboard where Mr. Goff had been seated.

Officer Easley then searched the remainder of the vehicle. He found a bag under Mr. Goff's seat containing quarters, other coins, and one-dollar bills totaling $60. Under the hood, he found a makeup bag containing two additional universal vending machine keys, as well as numerous other vending machine keys with codes on them. In the trunk, Officer Easley found a notebook that appeared to contain vending machine numbers corresponding with the keys found under the hood. Also in the trunk were rolling papers for coins, empty moneybags, and an unbroken padlock. Wire cutters, vice grips, pliers, and screwdrivers were in the back seat.

No one who could get into the vending machine money box to see what money was missing was present at the time of the arrest. But, once morning arrived, Hy–Vee store manager Steven Binseil found that someone had broken into the third machine and taken all of its coins. The dollar bills were still safe in a separate part of the machine.

Mr. Goff was charged with the class C felony of stealing, third offense. *Sec.* 570.040. He filed a motion to suppress the evidence found on his person and at the scene. This motion was overruled. At trial, the court again overruled his objection to admission of this evidence. The jury returned a guilty verdict. The court found Mr. Goff to be a prior and persistent offender under section 558.016 and sentenced him to fifteen years imprisonment. After opinion by the Court of Appeals, Western District, this Court granted transfer. *Mo. Const. art. V, sec. 10.*

## II. MOTION TO SUPPRESS

Mr. Goff argues on appeal that the trial court erred in overruling his motion to suppress the evidence seized from his person and car because the police lacked sufficient grounds to stop his car under *Terry.* Where, as here, a motion to suppress was overruled and the evidence was introduced at trial, an appellate court

will consider the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted. *State v. Edwards,* 116 S.W.3d 511, 530 (Mo. banc 2003); *State v. Deck,* 994 S.W.2d 527, 534 (Mo. banc 1999). The legal determination of whether reasonable suspicion existed is made *de novo. Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). The Court defers to the trial court's determination of credibility and factual findings, inquiring only "whether the decision is supported by substantial evidence, and it will be reversed only if clearly erroneous." *Edwards,* 116 S.W.3d at 530. *See also State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998).

*A. OFFICERS' COLLECTIVE KNOWLEDGE MAY BE CONSIDERED IN DETERMINING REASONABLE SUSPICION.*

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, permits police officers to briefly stop an individual if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot...." *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Such a stop, often referred to as a "*Terry* stop," applies to stops of both individuals and automobiles. *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Missouri courts have repeatedly applied the *Terry* rule, stating that to conduct a *Terry* stop, a police officer must have "a reasonable suspicion supported by articulable facts that those stopped are engaged in criminal activity." *State v. Miller,* 894 S.W.2d 649, 651 (Mo. banc 1995). *Accord, State v. Franklin,* 841 S.W.2d 639, 641 (Mo. banc 1992).

Here, however, Mr. Goff failed to properly preserve his claim of an improper *Terry* stop for review. At the motion to suppress hearing and at trial, he claimed only that: 1) the police lacked probable cause for his arrest and detention; 2) his arrest and the subsequent search of his person and vehicle was illegal; and 3) "the items searched for and seized" violated the Fourth Amendment of the United States Constitution and article I, section 15 of the Missouri Constitution. He did not assert that the initial *Terry* stop was not made based on reasonable suspicion. Because Mr. Goff's illegal stop claim must be raised at the earliest opportunity, *State v. Galazin,* 58 S.W.3d 500, 505 (Mo. banc 2001), he failed to preserve this claim for appellate review. As such, review is only for plain error. Rule 30.20. Plain error exists "where the alleged error 'facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice occurred.'" *State v. Baker,* 103 S.W.3d 711, 723 (Mo. banc 2003), *quoting, State v. Rhodes,* 988 S.W.2d 521, 526 (Mo. banc 1999).

Mr. Goff claims that, normally, a police officer is entitled to rely only on his own observations and information specifically communicated to him by another officer in developing reasonable suspicion or probable cause. An exception exists, he admits, where an officer makes a special request for assistance in, for example, the case of an emergency search for a missing child; in such a case, it would be unworkable to require every officer to be personally informed of every fact in the collective knowledge of the police working on the case. But, he says, where, as here, Officer Boydson did not specifically request Officer Easley to help her apprehend the two men, the propriety of Officer Easley's stop must be based solely on what Officer Easley himself observed and what was specifically communicated to Officer Easley when he overheard Officer Boydston's con-

versation with the dispatcher over the police radio. The court cannot, he argues, consider other information that Officer Boydson observed but did not specifically repeat over the radio. And, he argues, absent the latter information, Officer Easley did not have sufficient information to justify a *Terry* stop.

This Court need not determine whether Officer Easley had sufficient information to stop the car without considering the information known by Officer Boydston, for neither the cases cited by Mr. Goff nor public policy support drawing the distinction suggested by Mr. Goff in determining whether an officer had reasonable suspicion to support a *Terry* stop. As this Court and other courts have repeatedly recognized, whether a stop was made based on "[r]easonable suspicion is dependent upon the totality of the circumstances." *Franklin,* 841 S.W.2d at 644; *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (accord). Indeed, as this Court said in the context of analyzing whether an officer had probable cause for an arrest:

> We think the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause. The arresting officer himself need not possess all of the available information.

*State v. Pruitt,* 479 S.W.2d 785, 788 (Mo. banc 1972), *quoting, United States v. Stratton,* 453 F.2d 36, 37 (8th Cir.1972) (officers making a warrantless arrest of a counterfeiter based on information provided by the Secret Service can rely on "objective facts available for consideration by the agencies or officers participating in the arrest").[3]

None of these cases says that a specific communication between officers is required to permit officers to consider the collective information possessed by all of those officers involved in the investigation in making a determination of reasonable suspicion or probable cause. In fact, *Pruitt,* among other cases, specifically holds to the contrary. 479 S.W.2d at 788. This Court declines to change this rule.

■ This does not mean, as Mr. Goff suggests, that a police officer with insufficient facts to provide reasonable suspicion for a *Terry* stop will still be able to stop an individual in the hope that some other, yet unidentified, officer will later provide facts that would have constituted reasonable suspicion. The standard set out herein, and in the cited cases, does not permit after-the-fact bolstering of the involved officers' collective knowledge. The Court holds merely that the collective information in the possession of those with a nexus to the investigation can be considered in determining whether reasonable suspicion existed. Mr. Goff's argument that each officer is required to repeat his or her

---

3. *See also State v. Clayton,* 995 S.W.2d 468, 477 (Mo. banc 1999) ("probable cause is determined by the collective knowledge and the facts available to all of the officers participating in the arrest; the arresting officer does not need to possess all of the available information"); *Miller,* 894 S.W.2d at 653 (reasonable suspicion can be established "from the collective information known by the officers involved in the stop given the totality of the circumstances"); *State v. Futo,* 990 S.W.2d 7, 17 (Mo.App. E.D.1999) (proper to consider information known to both St. Louis and California authorities involved in case, and "knowledge of other involved officers and agencies is imputed to the arresting officer"); *State v. Sanner,* 655 S.W.2d 868, 874–75 (Mo. App. S.D.1983) (collective knowledge of all officers created probable cause for arrest when victim reported to one officer that shooter had escaped in a gold-colored vehicle, vehicle was found by different officers minutes later heading away from the scene, and person tried to evade police).

information to the officer making the stop in order to make the stop a constitutional one is rejected.

◼ Applying this standard here, the combined information of Officers Boydston and Easley was more than sufficient to justify a *Terry*-type stop. An officer need not be certain that criminal conduct is taking place; the officer needs merely to have reasonable suspicion of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (acts that seem innocent may, when combined, give rise to reasonable suspicion). Officer Boydston witnessed the two men illegally parked in the fire lane close to several Wal–Mart vending machines at 3:00 a.m. While Wal–Mart was still open, Officer Boydston was entitled to consider the lateness of the evening in determining whether there was criminal activity. *See Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (considering 2:15 a.m. as a factor for determining the reasonableness of a *Terry* frisk); *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir.1995) (stating that time of day is a relevant factor for *Terry* stops). She saw Mr. Goff attempting to enter locked doors when the unlocked doors near the middle of the store were more easily accessible, and then drive off without actually entering the store at all. Moreover, she learned that a person who operated the car had warrants for his arrest, and thereafter the car disappeared before she could recheck it.

To this can be added the emptiness of the lot, the fact that the car was stopped near locked doors rather than near the only open entrance, Mr. Goff's show of trying to open the locked doors once he saw her, and the warrant information known to Officer Boydston, as well as Officer Easley's knowledge that shortly after the two men left Wal–Mart he found them by other vending machines in the nearly empty Hy–Vee lot across the street. He witnessed them move their car and move away from the vending machines as soon as they saw him drive by, saw Mr. Goff buy a soft drink in the store even though the vending machines sold soft drinks, and saw Mr. Trent look around as if to be sure no one was watching him and then surreptitiously place in the engine compartment an object that appeared to be a bag.

This collective information was easily sufficient to satisfy the reasonable suspicion requirement, and the stop did not violate the Fourth Amendment.[4]

### B. OFFICER HAD REASONABLE SUSPICION FOR TERRY FRISK

◼ Mr. Goff also claims that because Officer Easley admitted at the suppression hearing that Mr. Goff did not make any furtive movements indicating he was reaching for a weapon, the officer lacked reasonable suspicion under *Terry* to frisk Mr. Goff, and the vending machine key found on his person was inadmissible. His argument is meritless.[5]

◼ Once a valid stop is made, police officers are permitted to pat a suspect's outer clothing for weapons if the officer "observes unusual conduct which

---

4. The requirements of article I, sections 10 and 15 of Missouri's constitution are also satisfied. *State v. Rushing*, 935 S.W.2d 30, 34 (Mo. banc 1996) (Missouri's provisions prohibiting unreasonable search and seizure are coextensive with Fourth Amendment).

5. Mr. Goff also argues that other evidence found in the car and in the vending machines after the frisk should have been excluded as "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). But as this Court finds that the search was proper, this argument is moot.

leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous...." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. The officer must have more than a hunch; he or she must have a reasonable, particularized suspicion that the suspect is armed. *Rushing*, 935 S.W.2d at 32.

■■■ The decision whether this standard was met is based on an objective standard, asking what a hypothetical officer in those same circumstances would have believed. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id. See also State v. Epperson*, 571 S.W.2d 260, 264 (Mo. banc 1978) (accord); *United States v. Roggeman*, 279 F.3d 573, 581 n. 5 (8th Cir.2002) (accord).

The trial court did not err in holding that the facts set out above as providing reasonable suspicion for the stop, combined with the outstanding warrant for Mr. Trent, the latter's arrest, and Officer Easley's need to search the vehicle, would have led a reasonably prudent officer in Officer Easley's position to believe, as Officer Easley testified he did believe, that he needed to pat down Mr. Goff for his safety.

## III. OTHER CLAIMS

■■■ This Court also rejects Mr. Goff's assertion that insufficient evidence was produced to prove a theft occurred. Noting that the Hy–Vee manager was unable to specify exactly how many coins had been in the vending machine before it was vandalized, he argues that the State should have been required to offer an accounting that reconciled the number of soft drink cans remaining with the dollar bills found in the machine to prove a theft occurred at all.[6]

Mr. Goff was convicted of the class C felony of stealing, third offense. *Sec.* 570.040. Conviction of this offense did not require proof that a specific amount of money was stolen. It merely required proof that Mr. Goff "appropriate[d] property or services of another with the purpose to deprive [the victim] thereof, either without his or her consent or by means of deceit or coercion." *Sec.* 570.030. The manager's testimony that the coins had been stolen met this standard. The strength of his testimony went to its weight, but it was clearly sufficient to support a jury finding that a theft had occurred.

■■■ The trial court also did not err in overruling Mr. Goff's motion for mistrial after Officer Easley volunteered during cross-examination, in response to a question asking about Mr. Goff's demeanor during the arrest, that, "Out there it was very polite, he understood the drill, he'd been through it before." Mr. Goff immediately objected, approached the bench, and requested a mistrial. The court refused to grant a mistrial, but did agree to give the

---

**6.** Appellate review of a sufficiency of the evidence claim "is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt," *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002), viewing the evidence in the light most favorable to the verdict, and accepting as true all evidence favorable to the State, including all favorable and reasonable inferences. *State v. Langdon*, 110 S.W.3d 807, 811 (Mo. banc 2003). All contrary evidence and inferences are disregarded "unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993).

jury a cautionary instruction "to disregard the last response of the witness."

A mistrial is a "drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995). This decision is left to the discretion of the trial court, as it is in the best position to determine whether the incident had a prejudicial effect on the jury. *State v. Roberts*, 948 S.W.2d 577, 605 (Mo. banc 1997). This Court looks only to whether the court, as a matter of law, abused its discretion in refusing to declare a mistrial. *Johnson*, 901 S.W.2d at 62.

There was no abuse of discretion here. Missouri courts have generally examined five factors in determining the prejudicial effect of an uninvited reference to other crimes.[7] Applying these factors here, this Court finds that the comment was vague and indefinite, the court promptly sustained an objection and instructed the jury to disregard the comment, and the comment was isolated in nature. Further, although Mr. Goff argues that the comment was intended to prejudice him, he concedes that the remark was volunteered on cross-examination and offers no evidence that the prosecution was in any way responsible for the remark.

The only other basis for prejudice Mr. Goff cites is an event that occurred during voir dire, which he says combined with the officer's testimony to increase the prejudice. During voir dire, a retired police officer was asked whether anything in his experience would cause him to be less than fair if selected for the jury. He replied, "I can honestly say that I've never arrested an innocent person. I don't know of any cop who ever did." The trial court overruled the defense's motion for mistrial. This is not raised as a separate point of error. Although the comment was unfortunate, it does not purport to address Mr. Goff in particular nor did it suggest that the prospective juror had any information about Mr. Goff's guilt, and the objection was immediately sustained. Officer Easley's single, volunteered comment on cross-examination later in the trial, even when combined with this earlier comment, could not have affected the verdict, particularly in light of the substantial other evidence connecting Mr. Goff to the vending machine theft.

For all of the above reasons, the judgment is affirmed.

All concur.

---

7. These five factors are: 1) Whether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; 4) whether the court promptly sustained defense counsel's objection to the statement, and instructed the jury to disregard the volunteered statement; and 5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt. *See, e.g., State v. Witte*, 37 S.W.3d 378, 383 (Mo.App. S.D.2001); *State v. Scott*, 996 S.W.2d 745, 749 (Mo.App. E.D.1999); *State v. Smith*, 934 S.W.2d 318, 320–21 (Mo.App. W.D.1996).