

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD77622 |
| | ) | |
| v. | ) | OPINION FILED: October 27, 2015 |
| | ) | |
| WILLIS JACKSON HARTMAN III, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Buchanan County, Missouri**
The Honorable Patrick K. Robb, Judge

Before Division Three: Joseph M. Ellis, Presiding Judge, Gary D. Witt, Judge and
Zel M. Fischer, Special Judge

Appellant Willis Hartman ("Hartman") appeals his conviction following a jury trial in the Circuit Court of Buchanan County, Missouri, for the Class C felony of use of a child in a sexual performance, under Section 568.080.[1]  Hartman raises two points on appeal.  In his first point, Hartman argues the trial court erred in refusing to grant a mistrial because the presence of members associated with the group Bikers Against Child Abuse ("BACA") around the courthouse deprived him of his rights to due process, a fair trial, and the presumption of innocence.  In his second point, Hartman argues that the trial court abused its discretion when it permitted the two child witnesses to wear vests with

---

[1] All statutory references are to RSMo 2000 cumulative as currently supplemented unless otherwise noted.

"BACA" inscribed on the back while testifying. For the reasons explained herein, we affirm.

## Factual Background

Hartman was convicted by a jury of the Class C felony of use of a child in a sexual performance. § 568.080. The children involved in the offense were ages five and seven. Hartman does not challenge the sufficiency of the evidence to support his conviction, and Hartman's argument does not involve the underlying factual allegations but rather the events surrounding the trial. Therefore, we do not need to detail the facts giving rise to the conviction.

Hartman's case was tried to a jury on Tuesday, April 22 and Wednesday, April 23, 2014. Prior to trial, on Wednesday, April 16, the trial court heard a motion from Hartman requesting that a number of signs placed around the Buchanan County Courthouse be removed. These signs had been placed on the courthouse lawn for child abuse awareness month by the Children's Advocacy Center ("CAC"), with the approval of the County Commission. Hartman argued the messages on the signs, which discussed child abuse statistics, could influence potential jurors reporting for duty and would be fundamentally unfair to Hartman. Hartman also noted that several members of the CAC staff were endorsed to testify at trial as witnesses for the State. The trial court agreed with Hartman that the signs should not remain on the lawn during trial as they could impermissibly influence the jury. The court was satisfied that the signs were to be removed by Friday, before the beginning of voir dire the following Monday, and the court also indicated it

would allow the parties to voir dire the potential jury on the subject of the materials on the courthouse lawn. From the record it appears that the signs were removed.

On Friday, April 18, a pretrial hearing was held at which the prosecutor informed the court that BACA, a child abuse victim advocacy organization, intended to have members present at the trial. Hartman's counsel expressed concern at the presence of the BACA members and the potential prejudicial effect that their anti-child abuse message could have on the jury. The trial court agreed and directed the prosecutor to inform BACA members that they were not allowed to wear their BACA vests, which had on them child-abuse prevention messages, in the courthouse or courtroom during the trial. The prosecutor also indicated that she had requested that no more than four members of BACA actually attend the trial at any one time. The prosecutor then informed the court that the child victims wanted to wear their own vests that had "BACA" on the back and agreed that she would not explain to the jury what "BACA" means.[2] The court stated that it would allow the victims to wear their vests. Hartman made no objection to the vests being worn by the victims.

On Tuesday, April 22, voir dire was concluded and the venire panel was released for lunch with instructions to return at 1:00 p.m. When the parties returned from lunch, Hartman moved for a mistrial based on the allegation that members of BACA were congregating on the courthouse steps at approximately 12:55 p.m. with the victims who were holding teddy bears. Hartman alleged that this occurred while members of the jury

---

[2] The vests only had the acronym "BACA" on the back and not the full name "Bikers Against Child Abuse."

3

were returning to the courthouse from lunch. Hartman, in support of his motion for a mistrial, called Public Defender Michelle Davidson ("Davidson") to testify. Davidson was not involved with Hartman's case but was at the courthouse merely to observe the trial. Davidson testified, in relevant part, as follows:

[DIRECT EXAMINATION BY HARTMAN'S COUNSEL]

Q.      Ms. Davidson, can you describe what you saw out in front of the courthouse before you got here?

A.      I wanted to watch the trial, so I arrived about five till 1:00 and I was coming in. And as I was coming in, I saw a large group of people. Some of them are sitting here in the courtroom. There were several others with them. They came with two children carrying teddy bears.
        They congregated in the front of the courthouse for quite a while and then they probably came in about five minutes later. I think they were waiting for their full group to get there.

Q.      Were they wearing any identifying clothing?

A.      I think they were probably the Bikers Against Child Abuse.

Q.      What would make you think that?

A.      They were wearing – some of them had something around their neck, I think, that involved motorcycles. And there's some that didn't come up. They stayed down with the children. And they were obviously – or at least they had the appearance of being bike riders.

Q.      What were they – were they saying anything?

A.      I think they were just kind of making sure all of their party was together and everyone was there. There was some introducing themselves. And then when they all got there – I don't know what they were doing. They were outside, like I said, for about five minutes and then they came in.
        And I think the children went towards the prosecuting attorney's office and some came upstairs and some followed the children.

4

Q.    And do you know of any other entrance to the courthouse?

A.    No.

[CROSS-EXAMINATION BY THE STATE]

Q.    Did you see any of these individuals speaking with any jurors?

A.    I do not know what they were talking about. When I saw the big group, I mean, it was – it was a very big group and it was – it drew my attention because of the two small children with the teddy bears outside in front of the courthouse.
So I asked Amy Cloud, I think it is now, to come out with me because I wanted to see what was going on. I don't know what they were talking about and I don't know who all they were talking to, if it was just among themselves or what. I cannot say.

Q.    So you don't know if any jurors even saw this congregation? The jurors could have all been in the courthouse by then, correct, as far as you know?

A.    I don't know. It was about five till 1:00. That's all I know.

[EXAMINATION BY THE COURT]

Q.    Ms. Davidson, let me ask questions so I'm clear on what I – when you say they were standing – they were standing outside the courthouse?

A.    On the courthouse steps.

Q.    On the courthouse steps, so right when you come in the public entrance to the courthouse?

A.    That's correct.

Q.    Is that what you're describing, those first couple steps coming in the entrance? And when you say a big group, what are you talking – five, six?

A.    Oh, no. It was probably 15 to 20.

5

Q.      15 to 20 people standing there? [3] So if you wanted to walk into the courthouse, you had to walk around them or through them or were they over to the side?

A.      They were – I don't – it didn't look like they were intentionally blocking people.  But they were a large group, so you would have had to either go around them or kind of make your way through them.

Q.      All right.  And did you see any signs or anything displayed on their clothing or any bumper – I mean, not bumper – stickers or buttons or anything like that?

A.      I saw around their necks – it was similar to – it would be similar to a juror's badge, but – and that's what I thought. I was like "Is that the jurors congregating out there?"
        But it had "Ride" – it was in reference to riding.  That's why I assume – and also – there were a couple of gentlemen that were obviously – if you saw them you would say, "They are bikers" because they had the appearance of bikers.

Q.      Okay. And you saw two children with them in that group?

A.      There was two small children and they were holding teddy bears.

Q.      Okay.  Anything else?

A.      (Shakes head.)

Q.      That's it?  So you just walked in past them?

A.      I walked in first.  And then I saw the big group and it drew my attention because usually you don't see a big group out there.
        So I asked Amy, I said, "I wonder if that's the jurors congregating." And I just know that that's probably improper.  So I said, "Will you go out there with me and we can see what's going on" just to be nosey.
        And I went out there.  And I did not hear them talking about, you know, the case. I heard one person make a comment, "I thought the jurors went in the side door" or something like that.  I did hear that comment.
But mostly I think they were just waiting for their party to all get there. They were introducing themselves, things like that.

---

[3] After the trial court heard the evidence, the prosecutor represented to the trial court that only six or seven of the individuals in front of the courthouse were associated with BACA and the rest were the victims' family members.

6

The court found no basis to declare a mistrial. The court explained that steps were taken to prevent any demonstrations or attempts to influence jurors and, from the evidence, the court did not find that any impropriety had occurred. The court also found that the prosecution had taken appropriate steps to ensure BACA members did not influence the jury or affect the trial.

Hartman then requested that the court prevent the victims from wearing their vests that had "BACA" inscribed on the back during their testimony. The court denied that request, reasoning that vests were not going to be worn by any other people in the courtroom, in the hallways, or outside of the courthouse per the direction of the court. In addition, there was no indication that the meaning of "BACA" would be presented to the jury. Accordingly, the trial court denied Hartman's request. Hartman was convicted by the jury of the Class C felony of use of a child in a sexual performance.

Hartman now raises two points on appeal regarding the presence of BACA members in and around the courthouse and the decision by the trial court to allow the victim witnesses to wear vests with "BACA" inscribed on the back while testifying.

**I.**

In his first point on appeal, Hartman argues that the trial court abused its discretion when it denied Hartman's motion for a mistrial in response to the BACA members' visible presence outside the courthouse with the child victims when the jurors were returning because it denied Hartman of his rights to due process, a fair trial, and the presumption of innocence, in that the trial court had already ruled that BACA members

should not be around the courthouse wearing items identifying them with their anti-child abuse message because of that message's likelihood of adversely influencing the fairness of Hartman's trial.

## Standard of Review

"A mistrial is a drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *State v. Ward*, 242 S.W.3d 698, 704 (Mo. banc 2008) (citing *State v. Goff*, 129 S.W.3d 857, 866 (Mo. banc 2004)). "This decision is left to the discretion of the trial court, as it is in the best position to determine whether the incident had a prejudicial effect on the jury." *Id*. Appellate review of the trial court's refusal to grant a mistrial is for abuse of discretion. *Id*. "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration." *Id*.

## Analysis

Hartman claims that the presence of identifiable BACA members with the child victims outside of the courthouse prior to trial, in a location where it was extremely likely members of the jury saw them, deprived Hartman of the opportunity to have a fair trial. Hartman does not attempt to show he was actually prejudiced but rather argues the circumstances were such that inherent prejudice must be presumed. There is no dispute that the BACA members were private spectators only and not directed or endorsed by the State.

8

The right to a fair trial, guaranteed by the Sixth Amendment to the United States Constitution, is a fundamental liberty. *Estelle v. Williams*, 425 U.S. 501, 503 (1976).[4] The presumption of innocence in favor of the accused is an essential component of a fair trial. *Id.* "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process." *Id.* In addition, the defendant must be tried in an atmosphere undisturbed by public passion. *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961); *State v. Peacock*, 725 S.W.2d 87, 90 (Mo. App. S.D. 1987) (elemental that due process includes the right to have a fair trial before an impartial jury uninfluenced by anything other than evidence, court instructions, and attorneys' arguments). Unfortunately, the actual impact of certain practices on jurors cannot always be known. *Williams*, 425 U.S. at 504. Accordingly, the United States Supreme Court has recognized that "certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 72 (2006) (citing *Williams*, 425 U.S. at 503-06).

The test for whether a *state-sponsored* courtroom practice is so inherently prejudicial that it deprives a defendant of a fair trial is well settled. For example, in *Williams*, the Supreme Court considered whether an accused person, compelled to wear identifiable prison attire at his trial, is denied due process or equal protection of the laws. 425 U.S. at 502. The Court explained that a state-sponsored practice is inherently prejudicial and deprives a defendant of his right to a fair trial if "an unacceptable risk is

---

[4] The Sixth Amendment is binding upon the States through the due process clause of the Fourteenth Amendment. *See Duncan v. Louisiana*, 391 U.S. 145, 158-59 (1968),

presented of impermissible factors coming into play" in the decision of the jury. *Williams*, 425 U.S. at 505. The Court held that it was inconsistent with the Fourteenth Amendment to compel an accused to stand trial while dressed in identifiable prison attire. *Id*. at 512. Based on "reason, principle, and common human experience" it was possible that forcing a defendant to wear prison attire would impair the basic presumption of innocence in favor of the accused and there was no essential state policy served in forcing him to do so. *Id*. at 503-05. Similarly, in *Holbrook v. Flynn*, the Supreme Court considered whether seating four uniformed police officers in the row of spectators immediately behind the defendant deprived him of a fair trial. 475 U.S. 560, 562 (1986). In that case, the Court held that the presence of the officers was not so inherently prejudicial that it denied the defendant the right to a fair trial, in that the Court did not believe it would brand the defendant with "an unmistakable mark of guilt." *Id*. at 571. In addition, even a slight degree of prejudice as a result of police presence would be justified by the State's legitimate interest in maintaining custody and security. *Id*. *See also Deck v. Missouri*, 544 U.S. 622, 628-29 (2005).

In contrast to state-sponsored courtroom practices, the United States Supreme Court has not squarely addressed whether *private-actor* conduct can be so inherently prejudicial that it creates a presumption that the defendant was deprived of a fair trial. *Carey*, 549 U.S. at 76. Indeed, the Court has never applied the test for inherent prejudice from *Williams* or *Flynn* to the conduct of private spectators. *Id*. Absent guidance from

10

the Supreme Court, lower courts have gone on a number of different paths. *See id*. at 76-77.[5]

One path taken by the lower courts is the path that Hartman urges this court to follow: the precedent from the United States Court of Appeals for the Ninth Circuit in *Norris v. Risley* that applied the *Williams* and *Flynn* test to spectator conduct. *See Norris*, 918 F.2d 828 (9th Cir. 1990); *see also In re Woods*, 114 P.3d 607 (Wash. 2005) (applying *Flynn* test to conduct of a private party). In *Norris*, an inmate in a habeas petition alleged that the jurors in his case were exposed to a large number of women wearing "Women Against Rape" buttons in public areas of the courthouse, in the courtroom, on their way to and from the courtroom, and while serving refreshments outside the courthouse. *Norris*, 918 F.2d at 829. He argued that this presence was inherently prejudicial and deprived him of a fair trial. *Id*. at 829-30. According to the Ninth Circuit, the question was whether the presence of the spectators wearing the buttons was "'so inherently prejudicial as to pose an unacceptable threat' to the right to a fair trial." *Id*. at 830 (quoting *Flynn*, 475 U.S. at 572). "A courtroom practice or arrangement is inherently prejudicial if 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id*. (quoting *Estelle*, 425 U.S. at 505). The Ninth Circuit found that the buttons conveyed an implied message encouraging jurors to find the defendant guilty and, because the message

---

[5] Despite the lack of a definitive answer from the United States Supreme Court regarding private spectator conduct, it has at least been suggested that it is likely a similar test would be used to address the conduct of private parties. In *Carey*, Justice Souter indicated that the test in *Williams* and *Flynn*, clearly established by the Court, would apply to conduct by private parties. 549 U.S. at 82 (Souter, J., concurring). This likely application of the *Williams* and *Flynn* test to at least certain classes of private spectators was suggested by a concurrence of Judge Breckenridge of the Missouri Supreme Court in *Johnson v. State*, 406 S.W.3d 892, 909-14. *Johnson* is not directly analogous, however, as it involved off-duty police officers in uniform observing trial, which is a "hybrid of the state-sponsored courtroom practice cases and those cases making spectator-conduct claims." *Id*. at 912.

11

conveyed could not be confronted or cross-examined at trial, the buttons were an impermissible factor. *Id.* at 830. Further, the court found the risk that jurors might be influenced by these impermissible factors was unacceptable, as they undermined the defendant's presumption of innocence and the right of confrontation and cross-examination. *Id.* at 831-33.

Other courts have refused to extend *Williams* and *Flynn* to cover spectators' conduct. *Carey*, 549 U.S. at 76; *see also, Billings v. Polk*, 441 F.3d 238, 246-47 (4th Cir. 2006) ("These precedents do not clearly establish that a defendant's right to a fair jury trial is violated whenever an article of clothing worn at trial arguably conveys a message about the matter before the jury"); *Davis v. State*, 223 S.W.3d 466, 474-75 (Tex. App. 2006) (no authority holds that a display of victim medallions by spectators creates inherent prejudice).

Still other courts consider spectator conduct claims without relying on or distinguishing *Williams* or *Flynn*. *Carey*, 549 U.S. at 77; *see State v. Speed*, 961 P.2d 13, 29-30 (Kan. 1998) (trial judge is charged with preservation of order and duty to see that justice is not obstructed and discretion will not be disturbed unless it appears that prejudice resulted from the denial of a legal right); *Buckner v. State*, 714 So.2d 384, 389 (Fla. 1998) ("a judge may objectively look to the extrinsic factual matters disclosed to the jury and then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant").

Neither Hartman nor the State have identified any Missouri cases directly on point discussing what standards have developed in Missouri applicable to the conduct of purely

12

private parties not taking part in the trial and whether certain conduct by private parties can be inherently prejudicial to a defendant. Indeed, most cases in Missouri that have discussed *Williams* and *Flynn* do so in the context of state-sponsored courtroom practices. For example, a number of cases discuss claims by defendants that they were deprived of the right to a fair trial because they were forced to wear prison clothing or shackles in front of the jury. *See State v. Harris*, 868 S.W.2d 203, 207-08 (Mo. App. W.D. 1994); *Neal v. State*, 99 S.W.3d 571, 576-77 (Mo. App. S.D. 2003); *State v. Sonnier*, 422 S.W.3d 521, 524 (Mo. App. S.D. 2014). There are also a number of cases which discuss a "hybrid" scenario in which a defendant claims the presence of off-duty uniformed police officers observing trial results in the deprivation of fair trial. *See Johnson v. State*, 406 S.W.3d 892, 903 (Mo. banc 2013); *Bello v. State*, 464 S.W.3d 284, 289 (Mo. App. W.D. 2015). These cases include the conduct of private spectators but spectators who are coated with the authority of the State. In addition, the Eastern District of this court has applied the inherent prejudice test in cases where a "courtroom arrangement" is challenged. For example, where individuals associated with child victims are allowed to be present with the victim while testifying, *see State v. Gollaher*, 905 S.W.2d 542, 546-47 (Mo. App. E.D. 1995) and where a witness is allowed to hold a teddy bear while testifying, *see State v. Dickson*, 337 S.W.3d 733, 742-44 (Mo. App. E.D. 2011). Both of these cases only pertain to "courtroom arrangements" and do not address conduct of private parties not taking part in trial.

Although the cases above are not exactly on point, we are not without guidance. The Southern District of this court in *Peacock* considered a claim by the defendant that

13

he was denied a fair trial because comments and gestures of trial spectators indicated their belief that defendant was guilty and may have influenced the jury. 725 S.W.2d at 89-90. As no objection was made at the time of trial, the court reviewed the claim under plain error review. *Id.* The court stated in *Peacock* that:

> [i]t is elemental that due process includes the right to have a fair trial before an impartial jury that has not been influenced by anything other than properly introduced evidence, the court's instructions, and the attorneys' arguments. That right is threatened if self-appointed guardians of the public's morals are permitted, through speech, gestures, demonstrations and the like, to make a calculated attempt to improperly coerce the jury into adopting the watchdog group's point of view. Courts should be extremely vigilant to ensure that such demonstrations do not occur, and, if they do, to take immediate corrective action.

*Id.* at 90. The court found that neither the judge nor bailiff noticed any alleged improper spectator behavior. *Id.* Further, the fact that defense counsel did not object during trial suggested he also did not notice any improper conduct. *Id.* The court reasoned that because the jury only imposed a nine-month sentence rather than the maximum penalty of five years suggested to the court that, even if the jury had seen or heard the alleged conduct, they were evidently not influenced by it. *Id.* Finding no manifest injustice or miscarriage of justice, the court found no plain error. *Id.*

In *State v. Muldrow*, the defendant claimed he was deprived of a fair trial as a result of an anti-domestic violence display located in the courthouse lobby, as the charges against him arose from the brutal murder of his former girlfriend and domestic partner. 145 S.W.3d 471, 473 (Mo. App. W.D. 2004). The defendant had requested that the court quash the entire jury panel. *Id.* The defendant did not argue actual prejudice, as he never attempted to prove that any members of the panel saw the display, but rather that the

14

circumstances were so outrageous that prejudice was inherent. *Id*. at 474. The court found that no such inherent prejudice was illustrated, explaining that "[t]he environment of a trial must give jurors, who may have been otherwise carefully selected, a sense or appearance of neutrality." *Id.* (quoting *State v. Baumruk*, 85 S.W.3d 644, 649 (Mo. banc 2002)). The court did not believe, in these circumstances alone, that the display, put in place for National Domestic Violence Awareness Month, conveyed that the court was either connected to the State in a positive way or defendant in a negative way and, as such, it did not manifest an inherently prejudicial environment. *Muldrow*, 145 S.W.3d at 474-75.

There are also a number of cases by our courts which consider conduct by spectators in the contexts of emotional outbursts in front of the jury. In *State v. Brooks*, the defendant claimed the emotional outburst of a spectator in front of the jury, in which the spectator screamed that defendant would "burn in hell for this," merited a mistrial. 960 S.W.2d 479, 489-90 (Mo. banc 1997). In response, the trial court barred the spectator from the courtroom and stated that, as the disruption was brief and the outburst spontaneous and unprompted by the prosecution, no mistrial was mandated. *Id*. at 490. In addition, the court discussed with the prosecution how to control any further outbursts for the remainder of the trial. *Id*. In analyzing the defendant's claim of error, the Missouri Supreme Court stated that such outbursts should be "prevented insofar as possible." *Id*. at 491. However,

> [w]here outbursts occur, the trial court may exercise broad discretion in minimizing or eliminating the prejudicial impact of an hysterical witness or gallery member. In determining whether to declare a mistrial, the trial

15

court may consider the spontaneity of the outburst, whether the prosecution was at fault, whether something similar, or even worse, could occur on retrial, and the further conduct of the trial.

*Id*. (citations omitted). The Court found that the steps taken by the trial court after the outburst and its refusal to declare a mistrial were a proper exercise of discretion. *Id*.

These cases, taken together, provide the standards by which we review Hartman's claim of error. Every defendant has the right to a fair trial and to be judged only by the evidence presented at trial, the instructions of the court, and the arguments of the attorneys. *Baumruk*, 85 S.W.3d at 650-51; *Peacock*, 725 S.W.2d at 90. The jury must be a neutral arbiter, and the courtroom a place of neutrality and free of coercion. *Baumruk*, 85 S.W.3d at 649. Another way of stating this would be that impermissible factors should not be permitted to influence the jury insomuch as they can be controlled.[6] The trial court should be extremely vigilant and take appropriate steps to minimize the possibility that a defendant will be prejudiced. *Peacock*, 725 S.W.2d at 90. Further, the trial court sits as an intimate observer of events at trial and is in the best position to judge whether certain conduct or messages are such that they risk depriving the accused of a fair trial. *Ward*, 242 S.W.3d at 704. Finally, the "[f]ailure to give the accused a fair hearing violates the minimal standards of due process." *Baumruk*, 85 S.W.3d at 650 (citing *Irvin*, 366 U.S. at 722).

---

[6] It is important to recognize that the public also has a qualified right to attend a criminal trial. *See Bello*, 464 S.W.3d at 290; *Waller v. Georgia*, 467 U.S. 39, 44–45 (1984). There are, of course, both attendant benefits and risks to having open trials. *Waller*, 467 U.S. at 46. Such benefits include that the public is available to ensure the accused is not unjustly condemned, can keep triers interested in their roles, and discourage perjury. *Id*. Risks include outbursts, commotion, shaming, and both deliberate and unintentional influences on the jury. "Where fair trial rights are at significant risk [ . . . ] the first amendment rights of trial attendees can and must be curtailed at the courthouse door." *Norris*, 918 F.2d at 832 (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564 (1980)).

The question remains, however, in the absence of a showing of actual prejudice, whether a defendant may demonstrate inherent prejudice resulting from the action of private parties. Put another way, must prejudice be presumed where the court finds that private parties have created an unacceptable risk that impermissible factors may influence the jury? Missouri precedent, cited above, suggests strongly that conduct by private actors or messages conveyed by them could be so inherently prejudicial as to deprive the accused of a fair trial,[7] but that is an issue that we need not decide today.

Assuming *arguendo* that Hartman could show that conduct by a private party could be inherently prejudicial to his right to a fair trial, Hartman has made no such showing here. The facts here fall well short of facts in *Norris*, the primary case upon which Hartman relies. In *Norris*, the court found that three of the six jurors had actually observed multiple women seated approximately sixteen feet from the nearest juror during trial wearing large buttons that highlighted the word "Rape." *Norris*, 918 F.2d at 831. The spectators conveyed the message that the defendant had raped the complaining witness and were a reminder that the spectators believed defendant's guilt before it was proven. *Id.* Further, the presence of the women during trial with their message "constituted a statement, not subject to cross-examination that in the opinion of the members of the Rape Task Force the complaining witness had been raped by the defendant." *Id.* at 833.

Hartman argues he was deprived of a fair trial because the child victims were likely seen by jurors while standing outside of the courthouse with teddy bears

---

[7] See also note 5.

surrounded by BACA members and family. Hartman also states that the children were escorted to the prosecutor's office by BACA members. Davidson, the attorney who viewed the scene and provided the entirety of the evidence upon which Hartman relies, did not actually see that any child abuse messages were being displayed or communicated. Rather, Davidson *assumed* that the individuals were BACA members because they had something around their necks involving a motorcycle and they looked like bikers. This is the entirety of the evidence by Hartman in support of an "inherently prejudicial" environment. There is no evidence BACA members were wearing anything with a message that pertained to child abuse prevention. There is no evidence BACA members communicated any message whatsoever to any member of the jury either inside or outside of the courtroom. Further, there was no evidence that the BACA organization was well known in the community or that any person, who did not have prior knowledge of the organization, would have had any idea that these "bikers" near the courthouse had anything to do with child abuse. Certainly, there was no evidence that any member of the jury knew what the BACA organization was or that any person they may have seen in or around the courthouse was in any way associated with that organization. We are not prepared to say that the mere presence of members of BACA creates an inherently prejudicial environment in the absence of a showing that an anti-child abuse message was actually being affirmatively communicated, whether it is through the wearing of items displaying a message or another form of communication.

As acknowledged by Hartman, the trial court took multiple affirmative steps to ensure that Hartman received a fair trial. The trial court agreed with Hartman that child-

abuse prevention signs located in and around the courthouse should be removed prior to trial and permitted questions regarding the signs during voir dire.[8]  In addition, the trial court specifically informed the prosecutor to instruct BACA members that they could not wear their vests, buttons, or have any other items with child-abuse prevention messages in the courtroom, inside the courthouse, or around the courthouse and instructed the court martial to enforce that prohibition.  There is nothing in the record to suggest that this order was not fully complied with in every respect.  There is no allegation whatsoever that any improper behavior occurred in the courtroom or that any messages were communicated to the jury.  Further, the court suggested that in the future BACA members should refrain from gathering in front of the court but rather go down and wait by the prosecutor's office, so as to avoid this potential issue in the future.

The trial court here should be commended for its extreme vigilance to guarantee that Hartman received a fair trial in an atmosphere free from impermissible factors.  Hartman has presented no evidence to suggest there was not a "sense or appearance of neutrality" throughout his trial.  *Johnson*, 406 S.W.3d at 903 (quoting *Baumruk*, 85 S.W.3d at 644).  There is no evidence, beyond speculation, that any impermissible influence reached or could have reached the jury.  These facts do not merit a finding of inherent prejudice such that Hartman was incapable of receiving a fair trial.[9]

---

[8] Hartman asserts he was prejudiced prior to trial by the presence of these signs, but was afforded the relief he requested in his motion for the removal of those signs and was given the opportunity to question the venire panel about the presence of those signs.  It is unclear what more relief Hartman argues he was entitled to.

[9] In Point II, Hartman argues that it was error for the trial court to allow the child victims to wear vests that had "BACA" on the back and the cumulative effect of the allegations in Point I combined with the wearing of the vests denied him his right to a fair trial.  As explained in Point II, this added fact does not change our finding that no inherent prejudice was demonstrated by Hartman.

19

Accordingly, as no inherent prejudice has been established and no actual prejudice demonstrated, the trial court did not abuse its discretion in refusing to grant Hartman's request for a mistrial. *See Flynn*, 475 U.S. at 572 ("if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over").

Point I is denied.

## II.

In his second point on appeal, Hartman claims the trial court abused its discretion when it denied Hartman's request to preclude the child victims from wearing their vests that displayed "BACA" on the back because it deprived Hartman of due process, a fair trial, and presumption of innocence in that the exposure of the jury to BACA members outside of the courthouse combined with the message on the children's vests conveyed that Hartman was guilty of the charge.

### Standard of Review

"The trial court has considerable discretion in matters regarding examination of witnesses." *State v. Powell*, 318 S.W.3d 297, 302 (Mo. App. W.D. 2010) (citing *Gollaher*, 905 S.W.2d at 546). "The exercise of that discretion should not be disturbed on appeal unless it has been abused or substantial harm has been improperly done to the complaining party." *Id*. (citing *Gollaher*, 905 S.W.2d at 546-47).[10]

---

[10] Hartman asserts that the appropriate standard of review here is the standard the court uses regarding the admission of evidence at trial. The issue presented is not what evidence the court has allowed in at trial, but whether it was appropriate to allow the children to wear a comfort item and whether the court abused its discretion in allowing the children to do so.

20

**Analysis**

Hartman argues that the cumulative effect of the presence of BACA members around the children prior to trial, considered in Point I, with the children wearing the vests while testifying was inherently prejudicial and deprived him of the right to a fair trial. Missouri courts have applied the "inherent prejudice" test for "courtroom arrangements," such as the utilization of non-standard procedures for minors while testifying. *See, e.g., State v. Dickson*, 337 S.W.3d 733, 742-45 (Mo. App. S.D. 2011); *Gollaher*, 905 S.W.2d at 546-47. These cases then consider whether the non-standard procedure presents the unacceptable risk that impermissible factors will come into play in the minds of the jurors that would erode the accused's presumption of innocence. *See Dickson*, 337 S.W.3d at 742; *Gollaher*, 905 S.W.2d at 547.

But, in dealing with minors involved in sexual abuse, courts are given more leeway to utilize non-standard procedures. *Powell*, 318 S.W.3d at 303.

> Young children, who are victims of sexual abuse, have great difficulty in recounting to juries the sordid details of their painful experience. Wide latitude should be granted to trial courts so that such victims can recount their experiences without being overwhelmed by crippling emotional strain. Their testimony is often of critical importance since they are often the only occurrence witness.

*Id*. (quoting *State v. Pollard*, 719 S.W.2d 38, 42 (Mo. App. E.D. 1986)). "However, behavior or argument designed solely to appeal to the jury's emotional sympathy for a witness is irrelevant and, therefore, improper." *Id*. (citing *State v. Knese*, 985 S.W.2d 759, 774 (Mo. banc 1999)). Essentially, when determining whether a courtroom practice presents the unacceptable risk that impermissible factors would come into play in the

21

minds of the jurors, the special status and needs of a child sexual abuse victim must be considered in the balance.

In *Powell*, the defendant, accused of child molestation, argued that the trial court abused its discretion in overruling his objection to child victims holding teddy bears during trial testimony. *Id*. at 302. Because Missouri courts had not directly addressed this issue, this court considered a number of cases from other jurisdictions and found persuasive their practice of weighing the beneficial effects of such comfort items against potential prejudice. *Id*. at 303.[11] We analogized the claim of error to other decisions involving the testimony of minor witnesses regarding traumatic events. *Id*. In *Pollard*, "we found no prejudicial harm to the defendant when the trial court permitted the mother of the six-year-old sexual assault victim to sit near the counsel table while the victim testified." *Id*. (citing *Pollard*, 719 S.W.2d at 42). Similarly, in *Gollaher*, "we declined to find plain error when the trial court permitted the grandfather of an eight-year-old girl, who had witnessed the defendant sodomize her young brother, to stand by the witness box and hold the girl's hand while she testified." *Id*. (citing *Gollaher*, 905 S.W.2d at 546). Therefore, in *Powell*, we found that the trial court considered the usefulness of the comfort items against the possibility of prejudice. *Id*. The trial court determined that the items were a source of familiarity and comfort and there was nothing to suggest the items were used in an attempt to elicit emotional sympathy from the jury. *Id*. Accordingly, we found no abuse of discretion in overruling defendant's objection. *Id*. at 304. *See also*

---

[11] In *Powell*, Section 491.725.3 was not yet in effect, which provides for the procedure to be followed if a child wants to testify with a comfort item. 318 S.W.3d at 303. In this case, no argument was made before the trial court or on appeal about potential applicability of Section 491.725.3. Accordingly, we decline to consider whether the statute was applicable or whether the procedures therein should have been followed. *See* Rule 84.13(a).

22

*Dickson*, 337 S.W.3d at 742-44 (trial court did not abuse its discretion in allowing child victim to testify while holding a stuffed animal).

As explained *supra* in Point I, the trial court took numerous precautions to make sure the presence of BACA members did not prevent Hartman from receiving a fair trial. There was no evidence beyond speculation that any member of BACA could have had an impermissible influence on the jury and no evidence that the environment at trial was anything other than one of neutrality. There is actually no evidence that inside or outside of the courtroom any juror ever saw or heard any message from a BACA member. We cannot say that the mere presence of members of BACA alone would create an inherently prejudicial environment.

The question now is whether the trial court's decision to allow the child victims, ages five and seven, to wear vests with "BACA" on the back while testifying changes this result. The court allowed the victims to do so because the victims felt supported by BACA. The trial court ensured that "BACA" would not be explained to the jury and that no other individuals would be allowed to wear the vests where they could be exposed to jurors, either inside or outside of the courthouse. The record shows that no questions were asked regarding the meaning of BACA, there is no indication that any effort was made to focus attention on the vests, and nothing indicates that the jury was informed regarding the meaning. There is also no indication that the use of vests was calculated to elicit emotional sympathy from the jury. Accordingly, we also find that the trial court did not abuse its discretion in allowing the child victims to wear the vests while testifying.

Courts are given significant discretion when it comes to the examination of children during trial, especially where the issues pertain to sexual abuse. We cannot say the trial court abused its discretion here in allowing the victims to wear vests inscribed with "BACA," where the trial court was extremely diligent and successful in ensuring that there was no unacceptable risk that impermissible factors influenced the jury.

Point Two is denied.

## Conclusion

For the reasons described herein, the judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur