

# Missouri Court of Appeals

### Southern District

#### Division Two

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
v. ) No. SD36081
)
BLAINE URIAH DOWNUM, ) **Filed: April 7, 2020**
)
    Defendant-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable Dean G. Dankelson

**<u>AFFIRMED</u>**

A jury found Blaine Uriah Downum ("Defendant") guilty of child molestation in the first degree, statutory rape in the first degree, resisting arrest by fleeing, and unlawful possession of a firearm. *See* sections 566.067, 566.032, 575.150, and 571.070.[1]  In this appeal of his convictions, Defendant raises nine points of alleged trial-court error.  Finding no reversible error, we affirm.

#### The Relevant Evidence and Procedural Background

We recite the evidence and the reasonable inferences therefrom in the light most favorable to the verdict.  ***State v. Lammers***, 479 S.W.3d 624, 630 (Mo. banc 2016).  We mention other information only to provide context for Defendant's points.

---

[1] Unless otherwise noted, all statutory citations are to RSMo 2016.  All rule citations are to Missouri Court Rules (2019).

1

Victim, eleven years old at the time of trial, is Defendant's daughter. Just one year earlier, she was visiting Defendant at his hotel room. Victim was playing on her phone when Defendant woke up and asked her if she wanted to have sex. Victim said no. Defendant asked again. When Victim again declined, Defendant took her by the wrists, threw her on the bed, and removed her clothes. Defendant licked Victim's vagina and then inserted his penis. It felt to Victim as if she was being stabbed with a knife, and she kicked until she got free of Defendant's grip. Upon freeing herself, Victim called her mother to come pick her up from the hotel. A week later, she told her mother what had happened.

Defendant, a persistent offender, had prior felony convictions in both Kansas and Missouri. When law enforcement officers were unable to make contact with him by their usual methods, they "attached an alert" for Defendant in their record management system. That alert would notify them if Defendant "c[a]me in contact with any law enforcement[.]"

On April 16, 2018, Officer Bobby Brown ("Officer Brown") was driving his patrol car by Defendant's last-known address when he saw Defendant exiting the home. Officer Brown stopped, told Defendant that he was under arrest, and asked him to put his hands behind his back. Defendant turned and ran. Officer Brown commanded Defendant "to stop or [he] would send [his] dog and [Defendant] would be bit."

Defendant, who was wearing a backpack, kept running. Officer Brown's dog (the "K-9") chased Defendant and was able to grab ahold of his backpack. Defendant shed the backpack and continued running. The K-9 eventually apprehended Defendant and took him to the ground. Officer Brown took Defendant into custody, and when a detention officer at the jail searched Defendant's abandoned backpack, he found that it contained a loaded handgun.

2

Defendant was charged with four felonies in an Amended Information. Counts 1 and 2 were based upon his sexual contact with Victim in Defendant's hotel room. Count 1 charged that Defendant committed first-degree child molestation in that, between February 15 and April 16, 2018, Defendant "subjected [Victim,] who was then less than twelve years old[,] to sexual contact," and Victim was Defendant's descendant by blood or adoption. Count 2 alleged that during that same timeframe, Defendant committed first-degree statutory rape in that he knowingly had sexual intercourse with Victim, a child less than twelve years old.

Counts 3 and 4 were based upon the subsequent events that occurred during Defendant's apprehension and arrest. Count 3 charged Defendant with resisting arrest in that, on April 16, 2018, Defendant resisted arrest by fleeing from law enforcement. Count 4 alleged that Defendant – a convicted felon – unlawfully possessed a firearm on that same date.

On June 13th and September 27th, Defendant filed "*pro se*" motions for a speedy trial. His trial was initially set to begin on August 15, 2018, but defense counsel requested a continuance to have more time to prepare for trial, and the date was moved to February 5, 2019.

The day before the February 5th trial was to begin, the State learned and disclosed that the Children's Center possessed Victim's "trauma narrative" relevant to the case. Defendant filed a "Motion to Dismiss or in the Alternative Exclude [Victim] and Associated [Children's Center] Workers as Witnesses" (the "motion to dismiss"). The motion to dismiss alleged that the State had committed a ***Brady***[2] violation in failing to turn over the

---

[2] ***Brady v. Maryland***, 373 U.S. 83 (1963).

trauma narrative at the same time it had provided other relevant documents to Defendant during the course of discovery.

The trial court held a hearing on the motion to dismiss the next day -- the morning of the first day of trial. Defendant argued that the late production of the trauma narrative put him in the position of either: (1) asking for a continuance to allow his attorneys to prepare for trial by investigating the trauma statement and witnesses thereto, thereby forfeiting his right to a speedy trial; or (2) having a timely trial but forfeiting his right to effective assistance of counsel since his lawyers would not be prepared to address the trauma narrative at trial. The trial court denied Defendant's motion to dismiss, but it granted (at least in part) Defendant's alternative request for relief by stating that testimony from certain Children's Center witnesses that related to the trauma narrative would be excluded.

After the motion to dismiss was denied, Defendant requested that they proceed to trial on counts 3 and 4 as scheduled, with counts 1 and 2 to be severed off for trial at a later date. When the trial court said that it would not grant Defendant's request for severance, Defendant requested a continuance on all counts, which the trial court granted. The case was then reset for trial on March 5, 2019, just 28 days later.

Prior to the start of the March trial, Defendant filed "Defendant's Fifth Motion in Limine Motion [sic] to Limit Police Presence in the Courtroom" ("the no-presence motion"). The no-presence motion asserted that "[p]revious Jasper County jury trial cases have had overwhelming police presence in the courtroom" and the police come "wear[ing] the regalia of being police[.]" The motion asked that all police officers be excluded from the courtroom in order to maintain a sense of neutrality.

4

Also prior to trial, the State had filed its "Notice of Intent to Admit Propensity Evidence[.]" It thereby gave notice to Defendant that the State intended to introduce evidence -- pursuant to article I, section 18(c) of the Missouri Constitution ("section 18(c)") -- that Defendant had previously committed the offense of first-degree child molestation against his other biological daughter, A.D., who was also under the age of twelve at the time of that sexual contact.

At trial, the trial court denied the no-presence motion,[3] noting that it could not tell who was a police officer and who was not as all of the officers present were in plainclothes and bore no visible signs of being connected to the police department.

A.D., then age thirteen, testified at trial as follows. When she was four years old, Defendant had touched her "in [her] inappropriate place like down there" when she was in his bedroom. Her entire testimony consumed seven of the 594 pages of trial transcript.

Just before the State rested its case, the prosecutor provided the following information to the trial court and Defendant:

> Your honor, during the break, my victim advocate, Betsy Gunlock [("Ms. Gunlock")], let me know that during the last break that one jurors [sic] [Juror Number 8], approached her, that she does know him outside of this case, and gave her a hug. They did not discuss anything to do with the case, or anything about the case itself, or the facts, or anything like that.

In discussing that revelation with counsel, the trial court noted that no one had asked potential jurors during *voir dire* whether they knew any members of the prosecutor's office or Ms. Gunlock. With the agreement of the parties, the trial court postponed ruling on defense counsel's request to question Ms. Gunlock until everyone had a chance to research

---

[3] The trial court first denied the no-presence motion before trial and then again when it was raised during the instruction conference.

the applicable law, believing that no harm could come from leaving Juror Number 8 on the jury to hear additional testimony while they did so.

Defendant then testified in his own defense, and he denied having committed any acts of abuse. In an attempt to cast doubt upon Victim's account, he testified that he has a tattoo around his penis (and introduced what purported to be a photograph of it) – something that Victim specifically said Defendant did not have. He also testified that he kept his pubic area shaved at the time of the charged events. Victim had testified that Defendant's pubic area was hairy.

**Analysis**

*Point 1 – Denial of Motion(s) for a Speedy Trial*

Point 1 claims:

> The trial court erred in denying [Defendant's] motion to dismiss due to the State's late disclosure of [Victim]'s "trauma narrative" in violation of [Defendant]'s constitutional rights to a speedy trial, to present a defense, and due process of law . . . in that trial counsel had no choice once the motion to dismiss was denied but to ask for a continuance in order to properly investigate the late disclosed material.

We disagree.

> To assess whether the constitutional right to a speedy trial has been respected or denied, the Court must balance four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *See State v. Edwards,* 750 S.W.2d 438, 441 (Mo. banc 1988); *Barker v. Wingo,* 407 U.S. 514, 533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

***State ex rel. McKee v. Riley***, 240 S.W.3d 720, 729 (Mo. banc 2007).

On appeal, Defendant asserts only that he "was denied his constitutional right to [a] speedy trial, caused directly by the State's ***Brady*** violation." His brief makes no attempt to apply the four factors listed above to the facts of his case. "When an appellant fails to

6

support contentions with relevant law and analysis beyond conclusory statements, we deem the point abandoned." ***Wallace v. Frazier***, 546 S.W.3d 624, 628 (Mo. App. W.D. 2018). Point 1 fails.

*Point 2 – Denial of Motion to Sever*

In his second point on appeal, Defendant claims the trial court erred in

> overruling [his] motion for severance of the resisting arrest and possession of
> a firearm charges from the child molestation and statutory rape charges,
> because this violated [Defendant]'s rights to due process, a fair trial, and to
> be tried only for the crime charge [sic] . . . since the jury was likely to
> consider the evidence of the resisting and weapon crimes in deciding the
> other charges and that evidence was more prejudicial than probative.

Our review of joinder and severance challenges is normally a two-step process, requiring us to first determine whether joinder was proper as a matter of law. ***State v. Green***, 505 S.W.3d 837, 839 (Mo. App. S.D. 2016). Here, because Defendant admits that joinder was proper and challenges "only the ruling denying the motion to sever[,]" we review the trial court's refusal to sever charges for an abuse of discretion. *See **id.***

Rule 24.07 and section 545.885, which govern the severance of offenses, require the defendant to make "a particularized showing of substantial prejudice" in order to obtain a severance. ***State v. McDonald***, 321 S.W.3d 313, 319-20 (Mo. App. S.D. 2010) (quoting the statute and the rule). Defendant claims that failing to sever the offenses prejudiced him because "the jury's learning that he was a convicted felon who ran from the police could not be assuaged in any other way other than severing the charges."

"In considering whether severance is required, the court considers 'the number of offenses joined, the complexity of the evidence, and the likelihood that the jury can distinguish the evidence and apply it, without confusion, to each offense.'" ***State v. McKinney***, 314 S.W.3d 339, 342 (Mo. banc 2010) (quoting ***State v. Morrow***, 968 S.W.2d

7

100, 109 (Mo. banc 1998)). ***McKinney*** held that charges need not be severed when "the evidence relating to the attempted escape charge and the murder and armed criminal action charges was 'sufficiently simple and distinct to mitigate the risks of joinder.'" ***Id.***

That situation is present here. Defendant's count 1 and 2 charges provided the basis for the State to also charge him with resisting arrest and possession of a firearm in counts 3 and 4. And the evidence related to each of the four charges was distinct and uncomplicated such that jurors could distinguish it and apply it without confusion about which charge was based upon that evidence. ***Id.***

Point 2 is denied.

*Points 3 and 4 – Refusal to Exclude Police Officers from the Courtroom*

For ease of analysis, we address these related points together.

Point 3 claims the trial court abused its discretion in "overruling [his] objection to the presence of a group of police officers sitting in the courtroom at the end of the trial . . . in that the presence of the officers . . . conveyed the message that [Defendant] was presumed guilty." Point 4 claims the trial court "abused its discretion in overruling [Defendant]'s request to make an offer of proof regarding the police presence in the courtroom at the end of the trial[.]" Defendant asserts that without such a record, this court would be unable to determine whether prejudice resulted from the trial court's ruling. No such impediment is present here because both claims are clearly refuted by the record.

"A trial court has wide discretion in determining whether to take action to avoid an environment for trial in which there is not a 'sense or appearance of neutrality.'" ***Johnson v. State***, 406 S.W.3d 892, 903 (Mo. banc 2013) (quoting ***State v. Baumruk,*** 85 S.W.3d 644, 650 (Mo. banc 2002)).

When Defendant objected to the officers' presence at trial, the trial court overruled the objection and made the following record.

> In looking out [sic] the audience there are two sides on either side of the aisle. There are people seated on both sides of the aisle. I don't see a badge or a gun amongst any of them. I wouldn't know who was a police officer, who was not a police officer, or what these folks are and I don't think there's any show that they are from [the Joplin Police Department]. I happen to know some of them so I know that they are. The jury is not going to have that idea, won't know if they are related to [Defendant] or to the State, and so there is no indication whatsoever that any of them are Joplin Police Department Officers. I don't see anybody with a jacket on indicating they are from the police department. I don't see anybody with a badge or a gun present and that's from my vantage point and the jury will be on the other side of the room, but will have the same vantage point. And I don't think anybody is going to know who they are. I don't think there is any prejudice to your client. It's an open courtroom. Folks are welcome to be here and we are going to proceed and the Court is not going to ask anybody to be excluded, except those who cannot properly maintain their behavior.

Defendant's argument that the trial court's decision constituted an abuse of discretion relies upon a federal case from the Ninth Circuit, *Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990) (*abrogated by Carey v. Musladin*, 549 U.S.70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006)), and a West Virginia case, *State v. Franklin*, 327 S.E.2d 449, 451 (W. Va. 1985). Both cases -- in addition to lacking any controlling authority -- are distinguishable from the circumstances here. The spectators in Defendant's proffered cases wore *visible* displays of slogans on buttons that carried a real potential to inflame the jury. In *Norris*, the defendant was convicted of sexual intercourse without consent. 918 F.2d at 829. During his trial, women in the gallery wore "Women Against Rape" buttons. *Id.* In *Franklin* – a fatality-producing driving under the influence of alcohol case – "MADD"[4] buttons were visible in the audience. 327 S.E.2d at 474.

---

[4] The case related that this was an acronym for "Mothers Against Drunk Drivers."

Here, the record affirmatively demonstrates that nothing the jury saw would give it any indication that any of the spectators in the gallery were police officers. The trial court is the "intimate observer of events at trial[.]" *State v. Hartman*, 479 S.W.3d 692, 702 (Mo. App. W.D. 2015). Its recorded observations constitute factual findings that we rightly defer to on appeal. *Id.* In addition, the State noted for the record (without any contradiction by defense counsel) that there were additional people in the courtroom, including witnesses who had testified, attorneys, and a reporter from a local newspaper, all of whom were dressed similarly to the plainclothes officers described by the trial court.

These recorded, first-hand observations reveal that the trial court did not abuse its discretion in refusing to remove the police officers from the courtroom. As for Defendant's claim that the trial court erred in refusing to allow him to make an offer of proof, "[t]he purpose of an offer of proof is to insure that the trial court and opposing counsel understand what evidence is being offered and its relevance to the case." *State v. Townsend*, 737 S.W.2d 191, 192 (Mo. banc 1987). Here, the point Defendant wished to convey through the offer of proof was the presence of "a number of police [officers] in the courtroom" prior to closing arguments, a claim that the trial court accepted as true. And defense counsel did not identify any additional evidence he believed the trial court should have before making its ruling.

Points 3 and 4 are denied.

*Point 5 – Refusal to allow an Inquiry into Potential Juror Misconduct*

Defendant's fifth point claims the trial court abused its discretion in overruling his request to "inquire of [Ms. Gunlock], Director of Prosecution Services, or [Juror Number 8],

10

about how they knew each other" when Juror Number 8 hugged and spoke to Ms. Gunlock during a break in the trial.

The following information is relevant to this claim. During the instruction conference, the trial court asked whether Defendant wished to make any further record in regard to Juror Number 8. Defendant said that he "would like to make inquiry of Ms. Gunlock[,]" to which the trial court responded, "I'm not going to permit that." The trial court again asked whether Defendant wished the court to take any "remedial action" on the issue of the interaction between Juror Number 8 and Ms. Gunlock. The discussion that followed, while lengthy, is highly relevant to our disposition of this point.

| | |
|---|---|
| [Defendant's Counsel]: | Your honor, the remedial action that I would like to take and actually know the extent that I need to take would require inquiry of Ms. Gunlock. I cannot recall from memory whether [the prosecutor] asked if they knew anyone from the prosecutor's office at that point in time. I am honestly uncertain as to whether that question was asked. I think it might've been, but I would like to know the nature of their relationship there, if it was one where it's extremely close and [Juror Number 8] didn't disclose that. And, like I said, I have an imperfect memory of whether that question was asked. I know it normally is. |
| [Trial Court]: | I don't recall that question being asked. I know specifically her name was not mentioned in voir dire by either side. |
| [Defendant's Counsel]: | That is correct, but I think there might have been a catch all question asked. And, in fact, there was what I believe a question asked: is there any other reason why I might not be able to sit on this jury. I think that might have encompassed that if it – |

11

| | |
|---|---|
| [Trial Court]: | Well, I think that would be requiring more out of this jury than I think we should expect out of them for that type of question. |
| [Defendant's Counsel]: | Well, I'm just wanting to make a record of my bases for wanting to conduct inquiry, Your Honor. |
| [Trial Court]: | Then that wouldn't be something Ms. Gunlock would testify to. That would be something that you're alleging juror misconduct because he didn't disclose something. And that's not something that she would provide an answer for. That's something he would provide an answer for. |
| [Defendant's Counsel]: | I would request that the Court conduct an inquiry into the nature of the relationship with Ms. Gunlock or permit myself. |
| [Trial Court]: | As I read the cases, I think – are you alleging that anything improper happened between a member of the prosecutor's staff and Juror Number 8? |
| [Defendant's Counsel]: | I don't believe so, but I am uncertain Your Honor. I didn't witness it. I am not a witness to that. Without the opportunity to conduct an investigation, I wouldn't be able to do so. I don't believe so. I believe that the prosecutor's office has a modicum [of] integrity to it in that respect. |
| [Trial Court]: | I guess the question I would have was there any conversation between Juror Number 8 and a member of the prosecutor's office. [Prosecutor?]. |
| [Prosecutor]: | In talking to Ms. Gunlock she said that nothing was discussed about this case. It was just a hi, [Ms. Gunlock], and a hug. |
| [Trial Court]: | Any other conversation more than that? |
| [Prosecutor]: | No, I don't believe anything. [Ms. Gunlock] was trying to get away because she realized she |

12

|                      |                                                                                                                                       |
|----------------------|---------------------------------------------------------------------------------------------------------------------------------------|
|                      | should not have contact with [Juror Number 8]. And the way I described it is she zigged and he zagged to come over and greet her.       |
| [Trial Court]:       | With those being the facts, [defense counsel], is there any relief that the Defense is requesting at this point in time?                |
| [Defendant's Counsel]: | Let me make inquiry of my client. . . .                                                                                              |
| [Trial Court]:       | You may speak with him.                                                                                                                |
| [Defendant's Counsel]: | The Defendant has requested that we not seek the relief that [Juror Number 8] be removed from the jury panel.                        |
| [Trial Court]:       | So you are prepared to continue with Juror Number [8] remaining.                                                                       |
| [Defendant's Counsel]: | I am, but I would like the record to reflect that I wish to make inquiry of both [Juror Number 8] and of Ms. Gunlock to conduct an investigation of the facts. |
| [Trial Court]:       | Well, I think the facts have been flushed out here.                                                                                    |
| [Defendant's Counsel]: | Okay.                                                                                                                                |

The conduct of a trial is within the discretion of the trial court, and its rulings will not be overturned absent a showing of an abuse of that discretion. *State v. Pendergrass*, 726 S.W.2d 831, 832 (Mo. App. S.D. 1987). Defendant argues that "the trial court here denied [Defendant] the ability to make a record about potential misconduct between a juror and a member of the prosecutor's staff." Assuming that the trial court did err in refusing to allow Defendant to inquire directly into potential juror misconduct by questioning Ms. Gunlock and/or Juror Number 8, Defendant suffered no prejudice because he did not ask the trial court to remove Juror Number 8 from the jury. To the contrary, Defendant affirmatively

stated that he wanted to "not seek the relief that [Juror Number 8] be removed from the juror panel."

"The rule requiring contemporaneous objections to the qualifications of jurors . . . . serves to minimize the incentive to sandbag in the hope of acquittal and, if unsuccessful, mount a post-conviction attack on the jury selection process." *State v. Wright*, 30 S.W.3d 906, 914 (Mo. App. E.D. 2000) (quoting *State v. Hadley*, 815 S.W.2d 422, 423 (Mo. banc 1991)). Defendant waived his error-claim by not seeking to have Juror Number 8 removed from the jury.

Point 5 is denied.

*Points 6 through 8 – Plain-Error Review Requested*

Defendant's next three points are unpreserved, and he requests plain-error review under Rule 30.20.

> "Rule 30.20 is no panacea which a criminal defendant can use to obtain appellate review of any alleged error that is unpreserved." *State v. Campbell*, 122 S.W.3d 736, 739 (Mo. App. S.D.2004). "[A]n appellate court is not required to engage in plain error review; the decision whether to grant or deny such a request is left to the court's discretion." *Id.* at 740. "The court may simply decline to exercise its discretionary authority to review the point for plain error." *Shifkowski v. State*, 136 S.W.3d 588, 590 (Mo. App. S.D. 2004).

> If we exercise our discretion and engage in the requested plain error review of unpreserved error, a "defendant must show not only that the trial court committed evident, obvious, and clear error, but also the existence of manifest injustice or a miscarriage of justice." *State v. Stuckley*, 573 S.W.3d 766, 768 (Mo. App. S.D. 2019).

*State v. Sinor*, No. SD 35936, 2020 WL 581879, at \*2–3 (Mo. App. S.D. Feb. 6, 2020) (footnote omitted). With that strict standard in mind, we proceed to an evaluation of Defendant's unpreserved points.

Point 6 claims "[t]he trial court plainly erred in allowing the [S]tate to introduce evidence of [Defendant]'s alleged molestation of A[.]D[.], [Victim]'s sister, because this propensity evidence was substantially more prejudicial than probative[.]"

Section 18(c) provides:

> Notwithstanding the provisions of sections 17 and 18(a) of this article to the contrary, in prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged. The court may exclude relevant evidence of prior criminal acts if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

While he admits that it "is clear" that A.D.'s testimony established Defendant's propensity to commit the charged crimes because "it shows that [Defendant] molested [Victim]'s sister in a similar manner[,]" Defendant argues that A.D.'s testimony should have been excluded because the prejudicial effect substantially outweighed the probative value.

We begin by noting that Defendant's argument omits an important word from the constitutional provision at issue, which allows the exclusion of "relevant evidence of prior criminal acts if the probative value of the evidence is substantially outweighed by the danger of *unfair* prejudice." **Id.** (emphasis added). Prior to the adoption of section 18(c), our case law permitted the introduction of prior criminal behavior only in limited circumstances, and it was never admitted to prove that the defendant had a propensity to commit the charged crime(s). *See **State v. Williams***, 548 S.W.3d 275, 281 (Mo. banc 2018) (noting that "it is safe to say a general prohibition against the use of propensity evidence in criminal cases has been firmly engrained in American jurisprudence throughout much of the nation's history") (footnote omitted).

15

Further, the job of "weighing" the probity of evidence, most of which is typically subject to credibility determinations, and then deciding what prejudicial evidence is "unfairly" prejudicial, is best left to the discretion of the trial court. And those discretionary calls are rarely overturned, even when they are properly preserved for review, let alone when they are reviewed only for plain error. *See **State v. Carr***, 50 S.W.3d 848, 856 (Mo. App. W.D. 2001).

We decline to undertake such a fact-intensive inquiry upon a cold record and exercise our discretion to deny plain-error review of Point 6.

Point 7 claims:

> The trial court plainly erred in overruling [Defendant]'s objection to forensic interviewer Ashlea Belcher's [("Ms. Belcher")] testimony that [Victim]'s provision of "sensory details" provided credibility to her story . . . in that the testimony of Ms. Belcher invaded the province of the jury, was more prejudicial than probative, and was improperly used to bolster [Victim]'s credibility.

Ms. Belcher had interviewed Victim about her allegations of abuse. Prior to playing Ms. Belcher's video-recorded interview of Victim for the jury, the prosecutor asked the following question and received the following answer:

| [Prosecutor:] | When you've gone to these trainings, are you taught to look for something in particular to try to determine credibility or whether or not you should be looking further into an allegation? |
|---|---|
| [Ms. Belcher:] | Yes. |

At that point, Defendant objected that such testimony was going down the path of improper bolstering. The prosecutor responded that she was "going to have [Ms. Belcher] testify about what things she looks for so that the jury can also be looking for them when they watch the interview." The trial court overruled Defendant's objection and allowed the

16

prosecutor to inquire into "what [Ms. Belcher] looks for without talking about what [Victim] actually said."

The prosecutor then resumed her questioning.

| [Prosecutor:] | Ms. Belcher are you taught to look for things in particular that might indicate whether a child has been coached or is telling something based on their own experience. *And to be clear, I do not want you to talk about specifically what [Victim] told you.* Just what you've been taught to look for? |
|---|---|
| [Ms. Belcher:] | So whenever I'm talking to a child, I am asking for a lot of details. When they are giving details of events with sensory, it tells me what they are feeling, they are seeing, or you know their description of what's going on. Can you repeat the last part of your question? |
| [Prosecutor:] | Is there anything besides those sensory details that you look for? |
| [Ms. Belcher:] | Just how things happen. You know I'm collecting facts. I'm wanting to know every detail of what they saw, felt, who was around, things like that. Also you had mentioned something about coaching. I usually ask kids, you know, have you told anyone about what's happened or has anyone talked to you about what's happened. I usually ask, you know, what kind of things were you told about what's happened. If the alleged perpetrator – you know I usually ask did they tell you anything to say or to do or tell you to keep a secret, things like that. |
| [Prosecutor:] | Do you look for a child's ability to correct you if you misstate something that she or he has said? |
| [Ms. Belcher:] | Yes. And hopefully in every single interview I have always said, you know, let me know if I'm getting anything wrong today or – and then I also assure the child if you don't know something or don't remember something, it is okay to let me know that too. |

. . . .

17

| | |
|---|---|
| [Prosecutor:] | Is it normal for a child to continue that disclosure process after that initial forensic interview with you? |
| [Ms. Belcher:] | Yes. |
| [Prosecutor:] | Do you also look for information that might be age appropriate for a child? |

. . . .

| | |
|---|---|
| [Ms. Belcher:] | Yes, especially in their details and sensory details. |

(Emphasis added.)

It is clear that the State sought, and Ms. Belcher provided, testimony that was general in nature regarding child sexual-abuse victims and did not explicitly or implicitly comment upon Victim's credibility. *See **State v. Chaidez**,* 543 S.W.3d 664, 669 (Mo. App. S.D. 2018). The trial court did not err, plainly or otherwise, in overruling Defendant's objections to that testimony.

Point 7 is denied.

Point 8 claims the trial court plainly erred in failing to, *sua sponte*, declare a mistrial when the State, during its closing argument, implied that Defendant's hotel room was "dimly lit[,]" a fact that was not in evidence.

> "Our review for plain error of a trial court's failure to *sua sponte* declare a mistrial is extremely limited." *State v. Collins,* 150 S.W.3d 340, 349 (Mo.App.2004). We are mindful that a mistrial is a drastic remedy that should be used sparingly and granted only in extraordinary situations. *State v. Clover,* 924 S.W.2d 853, 856 (Mo. banc 1996). Moreover, "'*sua sponte* action should be exercised only in exceptional circumstances.'" *Collins,* 150 S.W.3d at 349 (quoting *State v. Drewel,* 835 S.W.2d 494, 498 (Mo.App.1992)).

***State v. Stites**,* 266 S.W.3d 261, 266 (Mo. App. S.D. 2008).

The following information is relevant to this point. Part of Defendant's defense was that Victim had incorrectly identified areas of his pubic region, thus the incidents Victim

18

described at trial could not have really happened. Specifically, Victim testified that Defendant did not have a tattoo near his penis, but Defendant showed the jury a picture evidencing that he did. Defendant also testified that he kept his pubic area shaved at that time, while Victim testified that Defendant had hair in his pubic area.

In an attempt to blunt that argument, the prosecutor argued at closing as follows.

[Defendant] brought up the tattoo that's in the photograph. And his investigator took that photograph of [Defendant] in a brightly lit room where that is the focus. Do you think that that's what [Victim] was trying to focus on? She was in a dimly lit hotel being raped by her father.

The attorneys approached the bench, and the following colloquy ensued:

| [Defendant's Counsel]: | The lighting in the room was not introduced into evidence. |
| [Trial Court]: | That is correct, so let's move on. Is there any other corrective relief you are seeking? |
| [Defendant's Counsel]: | I would ask that [the prosecutor] correct that misstatement to the jury. |

When the prosecutor returned to her argument, she stated only that "[t]hey were in a room where [Defendant] had been sleeping."

After voicing no objection to the prosecutor's modified argument at trial (which left out the "dimly lit" statement), Defendant now argues for the first time on appeal that the trial court should have, *sua sponte*, granted a mistrial when the prosecutor "failed to correct her misstatement[,]" in that the "statement that the room was too dimly lit for [Victim] to see implied that she had outside knowledge of [Defendant]'s guilt that they had not heard." This complaint comes too late. Under these circumstances, the trial court did not err, plainly or otherwise, in "failing" to, *sua sponte*, declare a mistrial.

Point 8 is denied.

19

*Point 9 – Insufficient Evidence on Counts 1 and 2*

Defendant's final point claims the evidence adduced at trial was insufficient to support his convictions of first-degree child molestation and first-degree statutory rape in that the State's evidence failed to prove beyond a reasonable doubt that Defendant had sexual contact with Victim.

> In reviewing a claim that there was not sufficient evidence to sustain a criminal conviction, this Court does not weigh the evidence but, rather, "accept[s] as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignore[s] all contrary evidence and inferences." *State v. Latall,* 271 S.W.3d 561, 566 (Mo. banc 2008); *State v. Reed,* 181 S.W.3d 567, 569 (Mo. banc 2006). This Court "asks only whether there was sufficient evidence from which the trier of fact reasonably could have found the defendant guilty." *Latall,* 271 S.W.3d at 566.

**State v. Claycomb**, 470 S.W.3d 358, 362 (Mo. banc 2015).

Defendant's argument in support of his point does the exact opposite of what is required by our standard of review – it focuses entirely on testimony that was favorable to him, not on the lack of probative value of evidence favorable to the verdicts. **State v. Harris**, 549 S.W.3d 513, 516 (Mo. App. S.D. 2018). "His complete disregard for . . . our standard of review so weakens his arguments analytically as to strip them of any persuasive value." **Id.**

Point 9 is also denied, and Defendant's convictions are affirmed.

DON E. BURRELL, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

MARY W. SHEFFIELD, J. – CONCURS